UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                                    Case No. 24-45025

ROGER J. OTTOMAN,                                         Chapter 12

             Debtor.                                      Judge Thomas J. Tucker
_____/

**OPINION REGARDING THE MOTION TO LIFT THE AUTOMATIC STAY
FILED BY AMERICAN MORTGAGE FUND I, LLC**

**I. Introduction**

This case is before the Court on the motion filed by American Mortgage Fund I, LLC,

entitled "Motion to Lift Automatic Stay" (Docket # 68, the "Motion"). Objections to the Motion

were filed by the Debtor, Roger J. Ottoman, by the Debtor's non-filing spouse, Marcia C.

Ottoman, and by a creditor, Thomas Lee Walkley. The Court held a hearing on the Motion on

November 20, 2024, and then took the Motion under advisement.

For the reasons stated below, the Court will grant the Motion.

**II. Background**

The movant, American Mortgage Fund I, LLC ("AMF"), holds a mortgage on real estate

owned by the Debtor, located at 12745 Waterloo Road, Chelsea, Michigan (the "Property").

Before the Debtor filed this Chapter 12 bankruptcy case on May 21, 2024, AMF brought a

judicial foreclosure action in the Washtenaw County, Michigan Circuit Court, in the case

captioned *American Mortgage Fund I, LLC v. Shallow Creek Enterprises, Inc., et al.*, Case No.

23-000742-CF (the "Foreclosure Case"). Based on a mortgage on which the Debtor had made no

payments for almost 5 years, AMF obtained a judgment of foreclosure on April 2, 2024, entitled

"Final Judgment of Judicial Mortgage Foreclosure" (the "Foreclosure Judgment").[1] The

Foreclosure Judgment determined that AMF was entitled to foreclose on its mortgage against the

Property, and scheduled a Sheriff's foreclosure sale, to be held on May 16, 2024 unless the

Debtor paid the amount the court found then to be due and secured by AMF's mortgage, which it

quantified as $1,241,272.89, as of March 31, 2024. The foreclosure sale apparently was

adjourned until May 23, 2024, and then it was stayed by the automatic stay when the Debtor filed

this bankruptcy case on May 21, 2024.

In its Motion, AMF seeks relief from the automatic stay "to proceed with its foreclosure

sale." AMF argues the following three grounds for granting stay relief: (1) 11 U.S.C. §362(d)(1)

"cause" because, AMF alleges, the Debtor filed this bankruptcy case in bad faith; (2) 11 U.S.C.

§ 362(d)(2) because, AMF alleges, the Debtor has no equity in the Property and the Property is

"not necessary to an effective reorganization;" and (3) 11 U.S.C. § 362(d)(4) because, AMF

alleges, the Debtor's filing of his bankruptcy petition was part of a "scheme to delay, hinder, or

defraud creditors" that involved a pre-petition transfer of the Property without AMF's consent or

court approval.

If this Court were to find grounds under § 362(d)(4), and if AMF had requested it, the

Court could order stay relief against the Property that would apply not only in this case, but also

in any other bankruptcy case filed by anyone within two years after entry of the stay relief order

in this case. *See* 11 U.S.C. § 362(d)(4). But the Motion does not actually request such relief,

which is sometimes referred to as "*in rem*" stay relief. Rather, AMF's proposed order filed with

---

[1] A copy of the Foreclosure Judgment is attached as Exhibit 2 to AMF's Motion (Docket # 68-2).

2

the Motion merely requests a lift of stay to allow the foreclosure sale of the Property to proceed, and that the order be immediately effective.[2]

The Debtor and the other objecting parties dispute all of AMF's stay relief grounds, and object to stay relief.

## III. Discussion

### A. Section 362(d)(2)

Based on 11 U.S.C. § 362(d)(2), the Court will grant the relief from stay requested by the Motion.

Section 362(d)(2) states:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
> . . .
>
> > (2) with respect to a stay of an act against property under subsection (a) of this section, if—
> >
> > (A) the debtor does not have an equity in such property; and
> >
> > (B) such property is not necessary to an effective reorganization[.]

11 U.S.C. § 362(d)(2). Under this section, AMF has the burden of proving that the Debtor has no equity in the Property, while the Debtor has the burden of proving that the Property is "necessary to an effective reorganization." *See* 11 U.S.C. § 362(g).

#### 1. The Debtor has no equity in the Property.

First, the Court finds that the Debtor does not have any equity in the Property. The

---

[2] *See* Ex. 13 to Mot. (Docket # 68-13).

3

Debtor does not genuinely dispute this, and the following facts show that the total amount of the liens on the Property exceeds the value of the Property. As a result, the Debtor has no equity in the Property. *See, e.g., In re Cambridge Woodbridge Apartments, L.L.C.*, 292 B.R. 832, 840 (Bankr. N.D. Ohio 2003) ("[T]he debtor lacks equity in the property when the market value of the property is less than the amount of debt that it secures.").

### a. The value of the Property

As for the value of the Property, in his bankruptcy schedules filed with the Court on June 7, 2024, Schedule A/B and Schedule D, the Debtor declared under penalty of perjury that the value of the Property is $1.3 million.[3] The Debtor reiterated that this was the value of the Property in the proposed Chapter 12 plan that he filed on August 19, 2024.[4] During the hearing, Marcia Ottoman stated that the Debtor's $1.3 million valuation of the Property was based on a 2018 appraisal. That appraisal was dated December 14, 2018, and was done by Bruce E. Jones of RMS Commercial Group, LLC, of Toms River, New Jersey.[5] It appraised the value of the Property, as of November 28, 2018, as $1,310,000.[6]

AMF, on the other hand, alleges that the value of the Property is "only approximately $979,000.00."[7] In his written response to the Motion, the Debtor did not actually admit or deny this allegation. AMF's claimed value for the Property is based on an appraisal dated June 4,

---

[3] *See* Schedules A/B and D (Docket # 14) at pdf pp. 3, 13.

[4] *See* "Chapter 12 Plan of Reorganization" (Docket # 22) at pdf p. 11 (Liquidation Analysis).

[5] A copy of this appraisal was filed by both Marcia Ottoman (Docket # 78-2 at pdf pp. 43-50) and Thomas Walkley (Docket # 88 at pdf pp. 78-81).

[6] Docket # 78-2 at pdf p. 45; Docket # 88 at pdf p. 80.

[7] Mot. (Docket # 68) at ¶ 9.

4

2024, which was done for Dexter Township by Daniel S. Edwards of Peoples Company of Marlette, Michigan.[8] That appraisal was done in connection with a pre-petition application filed by the Debtor to grant a conservation easement on the Property. As a result, that appraisal purports to appraise only the value of the land, and therefore does not include the value of any buildings on the land, such as the Debtor's house.

For purposes of deciding the Motion, the Court will assume that the Debtor's claimed value is correct — *i.e.*, that the value of the Property is $1.3 million.

**b. The amount of the liens greatly exceed the value of the Property.**

The record is clear that the total amount of the liens on the Property exceed the $1.3 million value of the Property. During the hearing, the Debtor's counsel conceded this. And the Schedule D and Chapter 12 plan filed by the Debtor both clearly state this.[9]

The liens on the Property include the following, in the following order of priority:

a. Lien for unpaid real estate taxes as of the bankruptcy petition date — $1,693.00;[10]

b. Mortgage held by AMF — $1,241,272.89 plus interest, fees, and attorney fees accruing after March 31, 2024; and

c. Mortgage held by Thomas Walkley — at least $1 million; perhaps more.

_____

[8] A copy of this appraisal appears in at least two places in the record: first, at Docket # 37, at pdf pp. 42-44 (filed by Richard Walkley on September 4, 2024); and second, at Docket # 119, pdf pp. 3-5 (filed by AMF after the hearing on the Motion).

[9] *See* Debtor's Schedule D (Docket # 14) at pdf pp. 13-14, items 2.1 through 2.3 (listing creditors with liens against the Property as exceeding $1.3 million, without counting the amount of AMF's mortgage lien (listing that amount as "Unknown"); Debtor's "Chapter 12 Plan of Reorganization" (Docket # 22) at pdf p. 11 (Liquidation Analysis, showing "fair market value" of the Property as $1.3 million, and "liens" in the amount as $1.3 million, and therefore equity of $0.00).

[10] *See* Debtor's Schedule D (Docket # 14) at pdf p. 14, item 2.3; Debtor's "Chapter 12 Plan of Reorganization" (Docket # 22) at pdf p. 6.

The priority and amount of the above mortgage lien held by AMF is established by two final judgments that were entered in the Washtenaw County, Michigan Circuit Court before the Debtor filed this bankruptcy case. The first of these judgments was entered in a quiet title action filed by AMF against the Debtor Roger Ottoman, Marcia Ottoman, and Shallow Creek Enterprises, Inc. (an entity owned by the Debtor Roger Ottoman and Marcia Ottoman), captioned *American Mortgage Fund I, LLC v. Shallow Creek Enterprises, Inc., et al.*, Case No. 20-000215-CH (the "Quiet Title Action"). In a judgment entitled "Amended Judgment" dated August 22, 2023 and filed on August 25, 2023 (the "Quiet Title Judgment"), the Circuit Court ruled that:

- Roger Ottoman owns the Property;

- Roger Ottoman's ownership is subject to the mortgage recorded on July 25, 2018, which is held by AMF;

- AMF's mortgage "is a valid equitable first mortgage against the Property;"

- "no other party has an interest in the Property;" and

- the Amended Judgment must be recorded by the Washtenaw County Register of Deeds.[11]

The Quiet Title Judgment was recorded by AMF on September 7, 2023, and also by Thomas Walkley on September 13, 2023.[12]

The second final judgment is the Foreclosure Judgment, described in Part II of this Opinion, above, which was entered by the Circuit Court on April 2, 2024. That judgment

---

[11] A copy of this Quiet Title Judgment is filed as an exhibit to the Debtor's objection to the Motion (Docket # 95 at pdf pp. 23-25). The Quiet Title Judgment was entered after a remand from the Michigan Court of Appeals, following that appellate court's unpublished decision dated April 13, 2023. A copy of that Michigan Court of Appeals decision is filed in this case at Docket # 117, Ex. 1.

[12] *See* Debtor's Obj. to Mot. [etc.] (Docket # 95) at pdf pp. 12-13.

established the amount of AMF's claim secured by the AMF's lien as $1,241,272.89 as of March 31, 2024, which included "interest, fees, and attorney's fees" that had accrued as of March 31, 2024, and stated that "[i]nterest, fees, and other amounts due under the Promissory Note or Mortgage will continue to accrue until the amount due has been paid in full."[13]

The Foreclosure Judgment further confirmed that AMF's mortgage lien has priority over any mortgage lien claimed by Thomas Walkley. It did this where it provided that after the sheriff's foreclosure sale, if the Property is not redeemed within the 6-month redemption period,[14] Roger Ottoman, and certain other named entities, *including Thomas Walkley*, would be "forever barred and foreclosed from all redemption and claim to the Property."[15] This necessarily implies that any interest Thomas Walkley has in the Property is junior to the mortgage lien of AMF; otherwise, Thomas Walkley's mortgage would survive AMF's foreclosure as a senior lien. *See* Mich. Comp. Laws Ann. § 600.3130(1) (applicable to judicial foreclosure sales); Mich. Comp. Laws Ann. § 600.3236 (applicable to foreclosures by advertisement); *In re Parlovecchio*, 315 B.R. 694, 696 (Bankr. E.D. Mich. 2004) ("When not redeemed, a sheriff's deed ripens into legal title and cuts off all junior interests in the property that were not consented to by the mortgagee."); *In re Receivership of 11910 South Francis Rd.* (*Price v. Kosmalski*), 821 N.W.2d 503, 506 (Mich. 2012) (applying § 600.3236 to hold that "any liens preexisting the mortgage that is the subject of the foreclosure remain in the same order of priority as they existed at the time of

---

[13] Foreclosure Judgment (Docket # 68-2) at pdf p. 3.

[14] Because the Foreclosure Judgment was entered in a judicial foreclosure action, the statutory redemption period is 6 months. *See* Mich. Comp. Laws Ann. § 600.3140(1).

[15] Foreclosure Judgment (Docket # 68-2) at pdf p. 4.

the mortgage's execution"); *Swarthout v. Shields*, 152 N.W. 202, 204 (Mich. 1915) (mortgage foreclosure sale by holder of a first mortgage, without redemption, extinguished second mortgage).

Together, the Quiet Title Judgment and the Foreclosure Judgment clearly establish that AMF has a first priority lien on the Property (after any real estate tax liens), securing a debt in the amount of $1,241,272.89 plus interest and attorney fees accruing after March 31, 2024. Those two state court judgments, each of which states at the end that it is a "final order," are binding on this Court and on the parties, including the Debtor, Marcia Ottoman, and Thomas Walkley, under the doctrine of collateral estoppel. "'Collateral estoppel . . . prevents a party from relitigating issues of fact or law which were necessarily decided by a previous final judgment.'" *McCallum v. Pixley* (*In re Pixley*), 456 B.R. 770, 775 (Bankr. E.D. Mich. 2011) (quoting *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997)). Because the two judgments in this case are judgments of a Michigan state court, this Court must apply the Michigan law of collateral estoppel. *See Pixley*, 456 B.R. at 775-76. All of the requirements under Michigan law are met in order for collateral estoppel to apply with respect to the Quiet Title Judgment and the Foreclosure Judgment.[16]

---

[16] "Under Michigan law, the following requirements must be met in order for collateral estoppel to apply:

> (1) there is identity of parties across the proceedings,
>
> (2) there was a valid, final judgment in the first proceeding,
>
> (3) the same issue was actually litigated and necessarily determined in the first proceeding, and
>
> (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding."

*Pixley*, 456 B.R. at 776 (quoting *Phillips v. Weissert* (*In re Phillips*), 434 B.R. 475, 485 (B.A.P. 6th Cir.

Those judgments are binding on the parties and on this Court, and preclude the parties from presently contesting in this Court the rulings made in those judgments, described above. This is so even though the Debtor, Marcia Ottoman, and Thomas Walkley have appealed those state court judgments.[17] *See Taleb v. Kramer* (*In re Kramer*), 543 B.R. 551, 559 (Bankr. E.D. Mich. 2015) ("[T]he Court concludes that under Michigan law, a final (*i.e.*, not interlocutory) judgment has preclusive effect under the doctrine of collateral estoppel (also known as issue preclusion), even when the judgment is on appeal or the time for appeals has not yet expired."); *In re Basrah Custom Design, Inc.*, 600 B.R. 368, 377-78 (Bankr. E.D. Mich. 2019) (same).

The mortgage lien of Thomas Walkley is acknowledged by all the parties who are objecting to AMF's Motion. The Debtor, Marcia Ottoman, and Thomas Walkley all say that Mr. Walkley has a valid mortgage lien in the Property, and the lien secures a debt of $1 million or more owing to Mr. Walkley.[18] (They also contend that Mr. Walkley's mortgage lien has priority over AMF's mortgage lien, but that argument is precluded by the state court judgments discussed above.)

Based on the foregoing, the Court must conclude that the three liens against the Property

---

2010) (citation omitted)).

[17] The appeals are pending, but have been administratively closed by the Michigan Court of Appeals, due to the filing of this bankruptcy case. That is likely to change soon, however, because as explained below, this Court will be granting relief from stay to permit the appeals to continue to conclusion.

[18] *See, e.g.*, Debtor's Obj. to Mot. [etc.] (Docket # 95) at pdf pp. 8, 16; Debtor's Schedule D (Docket # 14 at pdf p. 13, item 2.1) (listing Walkley and his corporation as holding a claim secured by the Property of $1.3 million); Proof of Claim filed by Thomas Walkley on November 25, 2024 (Claim No. 4-1 in the Claims Register of this case) at pdf pp. 2-3 (asserting a claim of $1,300,000.00, fully secured by a mortgage in the Property); Marcia Ottoman's Resp. to [Mot.] (Docket # 78) at pdf p. 6 (referring to "valid mortgage" filed by "Tom Walkley"), pdf p. 14 (referring to "Tom's legitimate mortgage").

total at least $2,242,965.89, plus the amount of interest and attorney fees that have accrued under AMF's mortgage after March 31, 2024.

Because this total amount of the liens on the Property greatly exceeds the value of the Property, it is clear that the Debtor has no equity in the Property.

**2. The Property is "not necessary to an effective reorganization."**

**a. The applicable standard**

The Supreme Court has described what a debtor must show to avoid stay relief under § 362(d)(2), when the debtor has no equity in the Property. In *United Savings Ass'n. of Texas v. Timbers of Inwood Forest Assocs., Ltd*, 484 U.S. 365, 375-76 (1988), the Supreme Court held as follows:

> Once the movant under § 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the *debtor* to establish that the collateral at issue is "necessary to an effective reorganization." See § 362(g). **What this requires is** not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but **that the property is essential for an effective reorganization *that is in prospect*. This means, as many lower courts, including the en banc court in this case, have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time."** . . . [L]ack of any realistic prospect of effective reorganization will require § 362(d)(2) relief.

(Italics in original) (emphasis added) (citations omitted) (footnote omitted).

The Court concludes that the Debtor has not made the required showing in this case. The Debtor filed a proposed Chapter 12 plan, but there is no realistic hope that such plan can be confirmed. Nor is there any realistic hope that the Debtor can confirm any plan, either "within a reasonable time," as required by *Timbers*, or ever.

**b. The Debtor's proposed Chapter 12 plan**

10

The plan proposed by the Debtor, entitled "Chapter 12 Plan of Reorganization" (the "Plan")[19] groups claims and interests into five classes. In Class 2, the Debtor proposes to pay the $1.3 million secured claim of Thomas Walkley in full, over 30 years at 4% interest, at the rate of $6,206.40 per month, but only "to the extent of available cashflow."[20] The Plan further states that if and to the extent Walkley's secured claim exceeds the value of the Property, the claim will be treated as a general unsecured claim (in Class 4 of the Plan).[21]

The Debtor's Plan does not propose any specific payment to AMF on account of AMF's first mortgage, but instead states in Class 1, in substance, that there is a dispute as to the amount and priority of AMF's mortgage lien that must be determined. The Plan also states that if and to the extent AMF has an allowed secured claim and the claim exceeds the value of the Property, the claim will be treated as a general unsecured claim (in Class 4 of the Plan).[22]

In Class 3, the Debtor proposes to pay the claim of Dexter Township for real estate taxes in full, in the amount of approximately $1,693.00, in monthly payments over 36 months at 12% interest.[23]

In Class 4, the Debtor's Plan proposes to treat the general unsecured claims. This class

---

[19] Docket # 22.

[20] *See* Plan (Docket # 22) at pdf pp. 4, 6 (proposed treatment of Class 2, "4111 Investment Group and Assigns"). Thomas Walkley is the assignee of the mortgage from 4111 Investment Group, which is an entity owned and controlled by Walkley. (*See* Proof of Claim No. 4-1 in the Claims Register, at pdf pp. 1, 4-5, 10-12; Thomas Lee Walkley Obj. [to AMF's Mot.] (Docket # 85) at 1, 11); *see also supra* footnote 18).

[21] Plan (Docket # 22) at pdf p. 6.

[22] *See id.* at pdf p. 5 (proposed treatment of Class 1).

[23] *Id.* at pdf p. 6 (proposed treatment of Class 3).

11

includes two claims totaling approximately $125,942.64, plus any mortgage deficiency claims. But the Plan says that "[t]his class shall only be paid to the extent of available funds, and it is unlikely that this class will receive any payments."[24]

Finally, Class 5 of the Plan is for the equity holder of the Property, the Debtor Roger Ottoman, and says that Roger Ottoman will "retain his interests."[25]

**c. The Debtor's Plan cannot be confirmed.**

The Debtor's Plan cannot be confirmed. AMF has objected to confirmation of the Plan, and certainly will not agree to the Plan, which does not propose to make any payment to AMF. As discussed in Part III.A.1.b of this Opinion, above, AMF has a claim of over $1.2 million, secured by a first mortgage in the Debtor's Property, and that amount and priority are binding on the Debtor. The Court cannot confirm a plan in which the Debtor retains ownership of the Property without paying AMF's secured claim in full. Such a plan fails to meet the requirements for confirmation, including, among other possible provisions, 11 U.S.C. § 1225(a)(5). That section requires that in order to confirm a Chapter 12 plan, the plan must treat a secured creditor in one of three ways, none of which the Debtor's Plan proposes with respect to AMF. Section 1225(a)(5) requires as follows:

> (5) with respect to each allowed secured claim provided for by the plan—
>
> (A) the holder of such claim has accepted the plan;
>
> (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

---

[24] *Id.* at pdf p. 7 (proposed treatment of Class 4).

[25] *Id.* (proposed treatment of Class 5).

12

> (ii) **the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim**; or

> (C) the debtor surrenders the property securing such claim to such holder[.]

11 U.S.C. § 1225(a)(5)(B) (emphasis added).

The Plan fails to treat AMF's secured claim in any of these permitted ways, and therefore, the Debtor's Plan is not confirmable.

### d. The Debtor has failed to show that he can ever fund a confirmable plan.

The undisputed facts show that from his income, the Debtor cannot afford to pay *any* amount to any of his three secured creditors (Dexter Township, AMF, and Thomas Walkley), while still retaining the Property. As paragraph 10 of AMF's Motion accurately states,

> a. Debtor's 2023 Form 1040-SR Tax Return reflects that he has no income (actually negative adjusted gross income in the amount of –$27,828). This includes a loss of $31,396 from his farming operations; and

> b. Debtor's Form 106S (Summary of Assets and Liabilities) filed in this Bankruptcy matter shows a combined negative monthly income of –$29,676 and states that Debtor does not expect an increase or decrease in the next year (i.e. Debtor's losses from his farming operation and corresponding lack of income is not expected to change anytime soon)**.**[26]

The foregoing numbers are confirmed by the Schedules I and J filed by the Debtor in this case.

Schedule I shows that the Debtor and his spouse (Marcia Ottoman) have a large negative monthly income (–$29,676.00).[27] As the Debtor explains on line 13 of Schedule I,

> [U]nder Schedule F on Debtor's 2023 tax return, the farm gross income in 2023 was $305,990 and the expenses were $337,386, leading to a net loss

---

[26] Mot. (Docket # 68) at pdf p. 4 (citing Mot. Exs. 9 and 10).

[27] Schedule I (Docket # 14) at pdf p. 20, line 12.

of $31,396.[28]

When the negative income from the farm operations is combined with the Debtor's monthly

social security income of $1,430.00, and monthly income of $290.00 described as "carry-over

land that neighbors farm," the Debtor's total monthly income is a large negative amount:

–$29,676.00.[29] The total of the monthly living expenses listed in the Debtor's Schedule J is

$2,266.50, but this is unrealistically low, because the listed expenses *do not include any amount*

for mortgage payments, real estate taxes, property insurance, or other "rental or home ownership

expenses."[30] (The Debtor is not paying his real estate taxes, and the Debtor has not made any

mortgage payments *for at least 5 years*, *since at least July 2019*.)[31] When the listed Schedule J

expenses are subtracted from the monthly income, the Debtor's monthly net income is

–$31,942.50.[32]

 The Debtor declared under penalty of perjury that he expects this very dire financial

condition to continue. In Schedule I and Schedule J, the Debtor stated, under penalty of perjury,

that he does not expect an increase or decrease in either income or expenses "within the year

---

[28] *Id.* at line 13.

[29] *Id.* at lines 8a, 8e, 8h, 12.

[30] *See* Schedule J (Docket # 14) at pdf pp. 21-22, lines 4, 4a, 4b, 22c, 23c.

[31] It is undisputed that the Debtor has not made any mortgage payments to AMF in over five years. (*See* Mot. (Docket # 68) at pdf p. 1 ¶ 2; Debtor Obj. to Mot. (Docket # 95) at pdf p. 9 (admitting that the Debtor's last mortgage payment was in July 2019)). And no one alleges that the Debtor has made any mortgage payments to Thomas Walkley. Instead, the Debtor has been mired in litigation with AMF.

[32] *See* Schedule J (Docket # 14) at pdf p. 22, line 23c.

14

after" he filed his Schedules.[33]

The Debtor has alleged that he can raise money from his Property by selling a conservation easement.[34]  From this, the Debtor argues, he could obtain $400,000 to $600,000, which he could use to fund a reorganization plan.[35]  But there are several flaws in this argument.

First, even if the Debtor could obtain this much by selling a conservation easement on his Property, it would be nowhere near enough to pay AMF's secured claim in full, as any Chapter 12 plan must do in this case in order to be confirmed, *if* the Debtor is to retain the Property.

Second, the Debtor has not shown that there is any good reason to believe that he can obtain funding by selling a conservation easement, now or within a reasonable time in the future. While the Debtor says that the conservation easement is "in the application and due diligence stage," it "is not agreed to" yet,[36] and AMF indicates that it will object to the Debtor's sale of such a conservation easement.  According to AMF, selling a conservation easement will cause a significant decline in the value of the Property, and thereby greatly damage the value of AMF's collateral.  AMF's argument is supported by the June 4, 2024 appraisal of the Property that was done for Dexter Township, cited in footnote 8 above.  That appraisal concluded that the value of

---

[33]  *See* Schedule I (Docket # 14) at pdf p. 20, line 13; Schedule J (Docket # 14) at pdf p. 22, line 24.

[34]  In general terms, a conservation easement would limit the Property to agricultural use, and thereby limit development.

[35]  Marcia Ottoman gave this amount range during the hearing on the Motion.  Also during the hearing, the Debtor's attorney pointed to one of the exhibits filed with the Debtor's response to AMF's Motion — a letter from a consultant for Dexter Township to Marcia Ottoman dated May 6, 2024, suggesting that the amount might total $592,000.  (*See* Debtor's Obj. to Mot. (Docket # 95) at pdf pp. 14, 43).

[36]  *See* Debtor's Obj. to Mot. (Docket # 95) at pdf p. 8 (response to ¶ 3 of the Motion).

15

the land portion of the Property would decline from $979,000 before the easement to $362,000 after the easement — a decline of $617,000.[37]

The Debtor acknowledges that in order to sell such a conservation easement, the Debtor would have to file a motion seeking authority from this Court to do so, under 11 U.S.C. § 363(b)(1). Or alternatively, perhaps the Debtor could include such authority in a Chapter 12 plan, under 11 U.S.C. §§ 1222(b)(7) and 1222(b)(8). But this bankruptcy case has now been pending for six and one half months, and to date, the Debtor has never filed such a § 363 motion. And although the Debtor filed a proposed Chapter 12 Plan on August 19, 2024 (three and one half months ago), that Plan says nothing whatsoever about any conservation easement.[38]

The Debtor also argues that he might realize funds from a claim he has in litigation against a California entity called Lendtuit, LLC. But this is very speculative, and is not likely to happen any time soon in any event. The Debtor obtained relief from stay in this Court to continue litigating his claim against Lendtuit on August 6, 2024,[39] and a default was entered against Lendtuit in state court, but to date, no default judgment has been entered by the state court. During the hearing, the Debtor's attorney indicated that recently the state court declined to enter a default judgment against Lendtuit, while the appeals filed by the Debtor, Marcia Ottoman,

---

[37] *See* Docket # 119 at pdf p. 5.

[38] As to sources to fund the Plan, the Plan says only that:

> The Debtor(s) shall generate the funds necessary for the execution of this Plan through the earnings of the Debtor(s), and may sell assets to fund plan payments or finance its assets to fund plan payments.

Plan (Docket # 22) at pdf p. 9, Art. 11.A.

[39] Docket # 18.

16

and Thomas Walkley are pending. (Those appeals are in their infancy, and are currently administratively closed by the Michigan Court of Appeals.) Moreover, the Debtor has not shown how large a judgment he is likely to obtain against Lendtuit, and the Debtor has no knowledge about the extent to which a judgment against Lendtuit would even be collectible.

Next, the Debtor argues, vaguely, that he is seeking financing to raise money to fund a plan. But the Debtor has no income from which to pay a new lender, and has no assets to speak of that he could pledge in support of a new loan. Aside from the speculative and unliquidated claim against Lendtuit, LLC, just discussed, and the Property, which is greatly over-encumbered by the liens of Dexter Township, AMF, and Thomas Walkley, the Debtor values his only other assets at only a minimal value — $25,645.46.[40] The Debtor has not shown that there is any reason to believe that he could obtain any new financing to help fund a plan.

Finally, the Debtor argues that if necessary, he can sell some or all of the Property as a means of funding a *liquidating* Chapter 12 plan. There are lower court cases holding that a liquidating plan can be considered a "plan of reorganization," at least in Chapter 11, for purposes of 11 U.S.C. § 362(d)(2)(B). The Debtor cites *In re Colonial Center, Inc.*, 156 B.R. 452, 462 (Bankr. E.D. Pa. 1993).[41] *See also In re Kadlubek Fam. Revocable Living Tr.*, 545 B.R. 660, 666 (Bankr. D.N.M. 2016) ("Either liquidation or rehabilitation plans may be an 'effective reorganization' under § 362(d)(2)(B)."); *In re EM Lodgings, LLC*, 580 B.R. 803, 813–14 (Bankr. C.D. Ill. 2018) (assumes without deciding that "a liquidation may be an effective

---

[40] In his Schedule A/B, the Debtor lists as his other assets two used vehicles, tools, and certain other tangible personal property, all of which the Debtor values at a total of $25,645.46. (*See* Schedule A/B (Docket # 14) at pdf p. 10).

[41] *See* Debtor's Obj. to Mot. (Docket # 95) at pdf p. 4 n.2.

17

reorganization"). While these are Chapter 11 cases, the Court notes that both Chapter 11 and Chapter 12 authorize liquidating plans. *Compare* 11 U.S.C. § 1123(b)(4) *with* 11 U.S.C. §§ 1222(b)(7) and 1222(b)(8).

The Court will assume, for purposes of deciding the Motion, that it is possible for a Chapter 12 liquidating plan to be considered a "plan of reorganization." But even given that assumption, the Debtor has not met his burden to show, under *Timbers*, that there is "a reasonable possibility" that he can confirm a liquidating Chapter 12 plan "within a reasonable time."

First, the Debtor has not even proposed a liquidating plan. And the Debtor very much wants to *keep* the Property, which is the family farm, rather than *sell* it.

Second, the Debtor has presented no evidence that he has done anything whatsoever to try to market and sell the Property.

Third, the Debtor has not described in any detail whatsoever what a possible liquidating plan might provide in this case. The Court is left to guess what the specific terms of a liquidating plan might be.

For these reasons alone, the Court must reject the Debtor's argument about a possible liquidating plan, and conclude that the Property is not necessary to an effective reorganization under 11 U.S.C. § 362(d)(2)(B). *See, e.g.*, *EM Lodgings, LLC*, 580 B.R. at 814 (granting stay relief under § 362(d)(2)), in which the court stated:

> Assuming a liquidation may be an effective reorganization, a debtor bears the same burden to prove that an effective reorganization is in prospect, by presenting evidence of a reasonable possibility of a successful going concern liquidation within a reasonable time. The Debtor has not filed a liquidating

plan, a sale motion or a motion to employ a broker. . . .

> In chapter 11 cases, where stay relief to permit foreclosure is at issue, debtors often express a desire to control the sale of the property with a reasonable belief that a higher price could be obtained through normal commercial marketing efforts rather than through foreclosure. A lack of equity in the property in question is not necessarily fatal so long as the secured creditor is adequately protected **and the debtor is making demonstrable and timely progress toward a successful liquidation**. See [*In re Kadlubek Fam. Revocable Living Tr.*, 545 B.R. 660, 666-67 (Bankr. D.N.M. 2016)]. **However, relief from the stay is warranted where the debtor fails to present evidence of such progress**. *In re Biltwood Properties LLC*, 473 B.R. 70 (Bankr. M.D.Pa. 2012); *In re Western Sunset, LLC*, 2010 WL 2710579 (Bankr. S.D.Cal. 2010); *In re Mount Moriah Baptist Church, Inc.*, 2010 WL 1930937 (Bankr. S.D.N.Y. 2010)(if all the debtor can offer in response to a request for relief from the automatic stay is the hope that sometime in the future some purchaser may appear on the horizon with a sufficiently substantial offer, it cannot be concluded that an effective reorganization is likely).

(Emphasis added).

Fourth, if the Debtor were to propose a liquidating plan, such plan most likely could not be confirmed. The Debtor does not have assets of a sufficient value, and has no net income, to provide the funding that would be necessary to confirm a Chapter 12 liquidating plan. Selling the Property, whether in part or in its entirety, would not yield enough money to come even close to paying the liens on the Property, including the real estate tax lien and the mortgages of AMF and Thomas Walkley. Such a hypothetical future sale likely would not yield enough to fully pay even the claim of AMF, whose secured claim under its first mortgage is now substantially more than $1,241,272.89 (the balance as of March 31, 2024), and continually growing by the accrual of interest and attorney fees. AMF likely could block confirmation by objecting on the ground that the liquidating plan does not meet the requirement under 11 U.S.C. § 1225(a)(5), quoted

above, which requires that an objecting secured creditor's claim be paid in full, if the collateral is not surrendered. And as described above, the Debtor's other, unencumbered property is of only minimal value — not enough to pay the likely amount of allowed administrative expenses of this case, including the Chapter 12 Trustee's fee, allowed fees of the Debtor's counsel, and post-petition taxes, as would be required for confirmation by 11 U.S.C. §§ 1222(a)(2) and 1225(a)(1). Nor does the Debtor have any income whatsoever available to fund a plan. Under the circumstances, it is very doubtful that the Debtor could even propose a liquidating plan in good faith, as would be required for confirmation under 11 U.S.C. § 1225(a)(3).

For these reasons, the Debtor has failed to show that he is both willing and able to propose a liquidating plan that has a reasonable possibility of being confirmed, within a reasonable time, as required by *Timbers*. In making his vague and speculative argument about a possible liquidating plan, therefore, the Debtor has failed to meet his burden of showing that the Property is necessary to an effective reorganization under 11 U.S.C. § 362(d)(2)(B).

For all of the foregoing reasons, the Court will grant the stay relief sought by AMF's Motion, based on 11 U.S.C. § 362(d)(2).

**B. Sections 362(d)(1) and 362(d)(4)**

Because the Court is granting stay relief based on 11 U.S.C. § 362(d)(2), it is unnecessary to discuss or decide whether stay relief also should be granted based on 11 U.S.C. § 362(d)(1). The same is true for 11 U.S.C. § 362(d)(4), because AMF's Motion seeks the same stay relief that it seeks under § 362(d)(2), and nothing more. *See* discussion in Part II of this Opinion.

**IV. Conclusion**

For the reasons stated in this Opinion, and based on 11 U.S.C. § 362(d)(2), the Court will

enter an order granting the stay relief requested by AMF's Motion, to permit AMF's foreclosure to continue in state court, including a foreclosure sale of the Property.

The order also will grant stay relief to permit the Debtor, Marcia Ottoman, and Thomas Walkley to litigate to conclusion, in state court, their pending appeals in the Quiet Title Action and the Foreclosure Case. Given the stay relief being granted for AMF, it is both fair and appropriate to permit the Debtor, Marcia Ottoman, and Thomas Walkley to prosecute their pending state court appeals, and to seek in state court a stay of the Foreclosure Judgment pending appeal. The Court finds cause for this additional stay relief under 11 U.S.C. § 362(d)(1). During the hearing, AMF's counsel conceded that this additional stay relief is logical and appropriate, and no other party objected to it.

**Signed on December 6, 2024**

/s/ Thomas J. Tucker
**Thomas J. Tucker**
**United States Bankruptcy Judge**